STATE OF CONNECTICUT *v.* DOUGLAS DOUGHERTY
(AC 30295)

Robinson, Flynn and Sullivan, Js.

Argued June 3—officially released September 21, 2010

*Lisa A. Vanderhoof*, special public defender, for the appellant (defendant).

*Linda Currie-Zeffiro*, assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich*, state's attorney, and *Thomas M. DeLillo*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ROBINSON, J. The defendant, Douglas Dougherty, appeals from the judgments of conviction, rendered after a jury trial, pursuant to two informations that were joined for trial.[1] With respect to the Maple Court incident; see footnote 1 of this opinion; the jury found the defendant guilty of one count of robbery in the third degree in violation of General Statutes § 53a-136 and one count of larceny in the sixth degree in violation of

[1] Docket number CR-07-0130925 concerns the Maple Court incident. Docket number CR-07-0130926 concerns the Pineview incident.

General Statutes § 53a-125b. As to the Pineview incident; see footnote 1 of this opinion; the jury found the defendant guilty of one count of robbery in the first degree in violation of General Statutes § 53a-134, one count of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134, one count of conspiracy to commit burglary in the second degree in violation of General Statutes § 53a-48 and General Statutes (Rev. to 2005) § 53a-102, and one count of larceny in the sixth degree in violation of General Statutes § 53a-125b. On appeal, the defendant claims that the trial court (1) abused its discretion by admitting evidence of uncharged misconduct[2] and (2) improperly charged the jury on other crimes in evidence. We affirm the judgments of the trial court.

The following facts, which the jury reasonably could have found, are relevant to the claims in the defendant's appeal. On the evening of January 24, 2006, eighty-six year old Irene Smith, who lived alone in an apartment at the Maple Court senior housing complex in Danielson, was reading in her living room, where the window shade was only partially drawn. At approximately 8:45 p.m., someone knocked on Smith's front door. When she opened the door, Smith saw a person dressed in dark clothing and a black ski mask.[3] The defendant entered the apartment and told Smith that this was a robbery and that he wanted money. The defendant did not touch Smith and assured her that he was not going to hurt her. Smith got her purse from her bedroom and placed it on the kitchen table. The defendant removed an envelope containing approximately $100 from Smith's purse. He also removed the cord from Smith's

---

[2] More specifically, the defendant claims that it was improper for the court to admit evidence of the Maple Court incident in the Pineview case, and vice versa.

[3] Smith determined, on the basis of the intruder's voice, that the person was male and that he was white because the skin near his eyes was light. She described the person as being of medium height.

telephone and placed a small clock on a table. The defendant instructed Smith to wait until at least 9 p.m. before seeking help. Before he left the apartment, the defendant pulled the window shade in the living room down completely.

Two days later, on January 26, 2006, eighty-seven year old Stella Feige was watching television in the living room of her senior citizens apartment at the Pineview complex in Thompson. The shades on the two living room windows were not drawn. At approximately 6 p.m., Feige, who was sitting on the couch, looked into her kitchen and saw two people. Feige had not heard either of the two doors to her apartment open. Each of the intruders wore a black ski mask, and one was taller than the other.[4] The taller intruder walked into the living room and pulled down the shades, returned to the kitchen and pulled down the shade on the window there. Feige observed the taller intruder enter her bedroom and return to the kitchen with her purse. He removed $35 from Feige's billfold. The taller intruder asked Feige if she had more money. Feige replied that she did not and asked if she was the only person the intruders planned to rob. The taller intruder responded: "Yes, for today." After hearing the taller intruder's voice, Feige determined that the person was male. The shorter intruder, later identified as the defendant, remained by the kitchen table throughout the robbery and never spoke. Feige, therefore, was unable to identify the shorter person's gender.

As the intruders prepared to leave, the taller intruder pulled a knife from his jacket, displayed it to Feige and told her to remain on the couch until 7 p.m. or he would tie her to a chair. Before he left, the taller intruder disabled Feige's telephones by disconnecting the wires.

---

[4] The taller intruder was later identified as William McCrillis.

At 7 p.m., Feige went to a neighbor's apartment to telephone the police.

The defendant subsequently was arrested and charged with respect to both robberies.[5] Prior to trial, the state filed a motion for joinder and notice of its intention to offer evidence of uncharged misconduct in both cases. The motion for joinder was granted, and evidence of uncharged misconduct was admitted in both cases. The trial was held in February, 2008, and the jury found the defendant guilty of six of the eleven charges against him. He was sentenced to twenty-five years in prison. Additional facts will be addressed as necessary.

I

The defendant first claims that the court abused its discretion by admitting evidence of uncharged misconduct in each case. More specifically, the defendant claims that the factual characteristics shared by the charged and uncharged misconduct were not sufficiently distinct and unique to be a signature, modus operandi or logo, and, therefore, the jury could not logically infer that if the defendant was guilty of one crime, he also must be guilty of the other. The state contends that the misconduct evidence was cross

[5] In the Maple Court case, the defendant was charged with kidnapping in the first degree in violation of § 53a-92 (a) (2) (B), robbery in the third degree in violation of § 53a-136, burglary in the second degree in violation of General Statutes (Rev. to 2005) § 53a-102 (a) and larceny in the sixth degree in violation of § 53a-125b.

In the Pineview case, the defendant was charged with kidnapping in the first degree in violation of § 53a-92 (a) (2) (B), conspiracy to commit kidnapping in the first degree in violation of §§ 53a-48 and 53a-92 (a) (2) (B), robbery in the first degree in violation of § 53a-134 (a) (3), conspiracy to commit robbery in the first degree in violation of §§ 53a-48 and 53a-134 (a) (3), burglary in the second degree in violation of General Statutes (Rev. to 2005) § 53a-102 (a), conspiracy to commit burglary in the second degree in violation of § 53a-48 and General Statutes (Rev. to 2005) § 53a-102 (a), and larceny in the sixth degree in violation of § 53a-125b.

admissible because it was relevant to show that the defendant had a common plan to rob women who live alone in senior housing. We agree with the state.

"The admission of evidence of prior uncharged misconduct is a decision properly within the discretion of the trial court. . . . [E]very reasonable presumption should be given in favor of the trial court's ruling. . . . [T]he trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . [T]he burden to prove the harmfulness of an improper evidentiary ruling is borne by the defendant . . . [who] must show that it is more probable than not that the erroneous action of the court affected the result." (Citation omitted; internal quotation marks omitted.) *State* v. *Meehan*, 260 Conn. 372, 393, 796 A.2d 1191 (2002).

"It is well settled that evidence of prior misconduct is admissible for the purpose of showing knowledge, intent, motive, and common scheme or design, but is not admissible to prove that a defendant is guilty of the crimes with which he is charged. . . . Uncharged misconduct evidence relates to a collateral, uncharged crime and does not prove the commission of the principal crime with which the defendant is charged." (Internal quotation marks omitted.) *State* v. *Aaron L.*, 79 Conn. App. 397, 408–409, 830 A.2d 776 (2003), aff'd, 272 Conn. 798, 865 A.2d 1135 (2005).

"To admit evidence of prior misconduct properly, two tests must be met. The evidence (1) must be material and relevant, and (2) its probative value must outweigh the prejudicial effect of the evidence. . . . Evidence is material where it is offered to prove a fact directly in issue or a fact probative of a matter in issue. . . . Relevant evidence is defined in Connecticut Code of Evidence, § 4-1, as evidence having any tendency to make the existence of any fact that is material to the

determination of the proceeding more probable or less probable than it would be without the evidence. The commentary to that section makes it clear that there are two separate components of relevant evidence at common law, probative value and materiality. Evidence is relevant if it tends to support the conclusion even to a slight degree. . . . Materiality is determined by the pleadings (or information) and the applicable substantive law." (Internal quotation marks omitted.) Id., 409.

Our Supreme Court has identified two categories of common scheme or plan cases. See *State* v. *Randolph*, 284 Conn. 328, 343, 933 A.2d 1158 (2007). "In the first category, which consists of what most accurately may be described as true common scheme or plan cases, the nature of the charged and uncharged crimes combined with connecting evidence, if any, gives rise to a permissive inference that an overall scheme or plan existed in the defendant's mind, and that the crimes were executed in furtherance of that plan. In the second category of cases, which consists of what most accurately may be described as signature cases, the charged and uncharged crimes appear to be separate and discrete criminal acts, but the method of commission exhibits the existence of a modus operandi, logo, or signature, which, when considered in combination with other factors, such as the proximity of time and place of commission, gives rise to a permissive inference that the crimes were executed in furtherance of an overall common scheme or plan." (Internal quotation marks omitted.) Id. Under the facts of this case, we conclude that the latter category is applicable.

The following facts are relevant to our resolution of the defendant's claim. On August 10, 2007, the state filed a motion for joinder[6] and notices of its intention

---

[6] The court, *Robaina*, *J.*, granted the motion for joinder on September 19, 2007.

to offer evidence of uncharged misconduct in both cases.[7] In the notice in the Maple Court case, the state represented that it intended "to offer evidence of an alleged home invasion in which the defendant unlawfully entered a similar dwelling, occupied by a similarly situated victim, at night, while accompanied by [a] codefendant, William McCrillis, only two days after this alleged incident occurred. The evidence is relevant because it tends to show the defendant's identity, knowledge of the criminal nature of his conduct, and a common plan or scheme." In the Pineview case, the state gave notice that it intended "to offer evidence of an alleged home invasion in which the defendant unlawfully entered a similar dwelling, occupied by a similarly situated victim, at night, only two days prior to this alleged incident. In the uncharged incident, the defendant is alleged to have acted alone. The evidence is relevant because it tends to show the defendant's identity, knowledge of the criminal nature of his conduct, and a common plan or scheme."

At the hearing on the motion for joinder, the court, *Robaina, J.*, heard the proposed uncharged misconduct evidence. The state argued that the evidence was relevant because it tended to show the defendant's identity, knowledge of the criminal nature of his conduct and a common plan or scheme. More specifically, the state noted the similarities in the evidence: the time of day, the age and situation of the victims, dark colored ski masks, disabled telephones, closing window shades, stolen cash, and explicit instructions to wait before seeking aid. Moreover, the crimes were close in proximity and time. The state argued that the evidence was relevant and material in that it would help the jury to determine whether the defendant had planned to rob senior citizens in their homes. The defendant objected,

---

[7] The court, *Fuger, J.*, ruled on the cross admissibility of the evidence at trial.

arguing that the evidence was not relevant in that it did not show the defendant's identity, knowledge of the criminal nature of his alleged conduct or a common plan or scheme.

The state presented the following evidence at trial. The defendant was arrested on other charges and was imprisoned at Corrigan-Radgowski Correctional Center (Corrigan) during the spring and summer of 2006. Jason Link also was imprisoned there during that time, and the two often spoke to one another. During one of their conversations, the defendant asked Link if he had heard about the Maple Court incident and told Link that he, the defendant, "did it." The defendant also told Link that he had bound the victim with a telephone cord and that Lori A. Collette picked him up after the robbery.

Although Link was being held on another matter, on September 27, 2006, the state police questioned him about the Maple Court incident and whether a third party was involved. Link voluntarily informed the police of the conversation he had had with the defendant about the Maple Court incident. On the basis of Link's information, the police questioned Collette about the defendant. Collette knew the defendant and had had a conversation with him sometime during the winter months of that year. The defendant told Collette that he "got some money" from his grandmother,[8] took her telephone and told her to wait fifteen minutes before contacting the police. Collette[9] also told the police that she had heard that the defendant was involved in an incident with McCrillis, who also was an acquaintance of hers.[10]

---

[8] The defendant is not related to either of the victims.

[9] Collette testified at trial and admitted that she had been convicted of selling drugs and of larceny and that she used drugs herself.

[10] This court takes judicial notice; see *McCarthy* v. *Commissioner of Correction*, 217 Conn. 568, 580 n.15, 587 A.2d 116 (1991); of the fact that McCrillis pleaded guilty on October 10, 2008, to robbery in the first degree in violation of § 53a-134 (a) (3) and burglary in the second degree in violation of General Statutes (Rev. to 2005) § 53a-102.

Detective Jeffrey Payette of the state police questioned the defendant at Corrigan on October 2, 2006. Payette took a statement from the defendant after asking him what he knew about the Maple Court and Pineview incidents. Initially, the defendant told Payette that he was not going to "snitch" on the people responsible for the incidents. The defendant, however, told Payette that he was responsible for driving the individuals to the senior housing complexes and that he knew they were going to rob someone. With respect to the Maple Court incident, the defendant told Payette that he drove "a kid" to Maple Court and dropped him off, knowing that the kid was going to rob somebody. The defendant drove to a bar in Killingly, turned around and came back to pick up the kid. The kid told the defendant that the lady was very polite. The defendant was given $40 in exchange for drugs. The defendant stated that he was familiar with the Maple Court apartments because his grandmother had lived there before she died.

With respect to the Pineview incident, the defendant told Payette that he drove the kid and McCrillis to the area of the apartments, knowing that they intended to rob someone. After dropping them off, the defendant drove away, turned around and came back to pick them up. The pair gave the defendant money in exchange for drugs. The defendant described the kid as being thirty-four years old and having lived in the Greek Village section of Thompson. The kid had an addiction to crack cocaine and had spent time in jail for having committed similar crimes. On the basis of his investigation of the two incidents, Payette determined that the defendant was thirty-four years old, had lived in the Greek Village, was addicted to crack cocaine and had committed similar crimes prior to January, 2006.

On appeal, the defendant claims that the factual characteristics shared by the charged and the uncharged crimes were not sufficiently distinctive and unique as

to be a signature, modus operandi or logo from which the jury reasonably could infer a common scheme or plan. In particular, the defendant notes that the intruder acted alone in the Maple Court incident and that the taller of the two intruders, who was not the defendant, performed the signature acts in the Pineview incident. The defendant concludes, therefore, that the state failed to establish that he had a plan to commit both the charged and the uncharged crimes.

A trial court properly may join two cases for trial "because, in the event of separate trials, evidence relating to each of the cases would have been admissible in the other. Although evidence of other crimes or uncharged conduct is not admissible to show bad character or a disposition to commit a crime, such evidence is admissible to show such issues as a common scheme, intent, malice, identity, motive or opportunity. . . . Of course, this evidence must be relevant and material to an element of the crime and its probative value must outweigh its prejudicial effect. . . . It is [b]ecause of the difficulties inherent in this balancing process that the trial court will be reversed only when there is a manifest abuse of discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Greene*, 209 Conn. 458, 464–65, 551 A.2d 1231 (1988).

On the basis of our review of the evidence in the record, we conclude that the court did not abuse its discretion by admitting uncharged misconduct of the Pineview incident in the Maple Court case and vice versa. "[O]ne of the most decisive factors [to support a permissive inference] is the proximity of time and place of commission of the charged and uncharged crimes. Accordingly, when both the charged and uncharged crimes exhibit the existence of a signature, and were committed within the same limited geographic area and time period, a permissive inference ordinarily arises that the charged and uncharged crimes were the

individual manifestations of a true plan in the defendant's mind." *State* v. *Randolph,* supra, 284 Conn. 355.

The evidence at issue here was relevant and material as to the identity of the perpetrator in both cases and permitted the jury to infer an overall scheme or plan in the mind of the defendant. The manner in which the crimes were committed in each incident was sufficiently distinct to constitute a signature, modus operandi or logo. The robberies occurred in the early evening in an apartment in a senior citizen complex, the victims were elderly women who lived alone, the robbers wore black ski masks, took money, closed the shades, disabled the telephone and instructed the victims to wait a specific amount of time before seeking help. Such evidence therefore had a tendency to help the jury determine the identity of the perpetrator who had a common scheme to burgle and to rob elderly women residing alone in a senior citizen complex. See, e.g., *State* v. *Greene,* supra, 209 Conn. 465 (uncharged misconduct admissible when "robberies were committed by nearly identically dressed men, using identical weapons, robbing similar establishments at similar times of day within three days of each other and in the same vicinity"); *State* v. *Braman,* 191 Conn. 670, 678, 469 A.2d 760 (1983) (evidence of prior robbery admissible to establish common scheme as both establishments were bars in adjoining towns, two people participated in each robbery, weapons used were cut-down shotgun and small automatic pistol, robber with shotgun assumed leadership, employees and patrons ordered into back room, incidents close in time).

Although the defendant argues that the state's evidence demonstrated that it was the taller person, not the defendant, who performed the so-called signature acts, that fact is merely one of the dissimilarities between the Maple Court and Pineview incidents that had to be weighed with the similarities. We conclude

that the court properly weighed the similarities between the two incidents with the dissimilarities. We also conclude that court properly found that the probative value of the evidence outweighed its prejudicial impact. The court, therefore, did not abuse its discretion by admitting the evidence of uncharged misconduct in both cases.

## II

The defendant's second claim is that the court improperly instructed the jury on evidence of uncharged misconduct. The defendant claims that the charge given by the court "essentially said that sufficient similarities in the cases were enough to establish a common scheme or plan." We do not agree.

The defendant takes exception to the following portion of the court's charge: "I'm going to talk a little bit about evidence of uncharged misconduct. In this proceeding, there are two separate cases. There's one case that alleges crimes to have been committed on January 24, 2006, in the town of Killingly, and another case that alleges crimes to have been committed on January 26, 2006, in the town of Thompson. Now, ordinarily, we tell juries not to consider either of the cases in evaluating the other case. In this case, however, there is but one limited purpose that you may consider the evidence in one case in the other case. And that is for you to determine that there are sufficient similarities in the cases that constitute a common scheme or plan for committing these types of crimes. It may not be considered by you, however, to determine that the defendant has a propensity to commit criminal acts or that he is in any way a bad person. You may not ever use the evidence in one case in the other case for that purpose. You may use it if you find that the evidence logically and rationally demonstrates a common scheme in the commission of robbery or burglary. You

may use the evidence in one case in considering whether the state has met its burden of proof in the other."

The defendant argues that the court should have instructed the jury with the following language from *State* v. *Randolph*, supra, 284 Conn. 355: "[T]o establish the existence of a true plan in the defendant's mind based *solely* on the marked similarities shared by the charged and uncharged crimes, the state must produce sufficient evidence to: (1) establish the existence of a signature, modus operandi, or logo; *and* (2) support a permissive inference that both crimes were related to an overall goal in the defendant's mind." (Emphasis in original; internal quotation marks omitted.) We disagree that the court should have charged the jury with the quoted language, as the quoted language concerns the standard the court is to apply in exercising its discretion as to the admission of uncharged misconduct evidence.

The standard by which claims of an improper jury charge are reviewed is well established. "[I]ndividual jury instructions should not be judged in artificial isolation, but must be viewed in the context of the overall charge. . . . The pertinent test is whether the charge, read in its entirety, fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . Thus, [t]he whole charge must be considered from the standpoint of its effect on the [jurors] in guiding them to the proper verdict . . . and not critically dissected in a microscopic search for possible error. . . . [W]e must consider the jury charge as a whole to determine whether it is reasonably possible that the instruction misled the jury. . . . In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Wallace*, 290 Conn. 261, 272–73, 962 A.2d 781 (2009).

"[T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Gonzalez*, 106 Conn. App. 238, 253, 941 A.2d 989, cert. denied, 287 Conn. 903, 947 A.2d 343 (2008).

On the basis of our review of the court's charge, we conclude that it complies with the admonition of our Supreme Court in *State* v. *Randolph*, supra, 284 Conn. 367. The court informed the jury of the "the very purpose for which the evidence of uncharged misconduct had been admitted, namely, to establish the existence of a common scheme or plan in the defendant's mind . . . ." Id.

The judgments are affirmed.

In this opinion the other judges concurred.